LANGLEY *v.* D'AUDIGNE.*

LANDLORD AND TENANT; MECHANICS' LIENS.

A provision in a lease giving the lessee the right to make improvements in a leased building, and providing that, if made, their cost, not to exceed a certain sum, may be deducted from the rent, does not

*Mechanics' Liens.*—For the somewhat similar question as to mechanics' lien on landlord's interest for labor or materials furnished tenant for the building or improvement removable by tenant, see case note to *Oregon Lumber Co.* v. *Beckleen,* 6 L.R.A.(N.S.) 485.

convert the lease into a building contract, so as to make the lessee the agent of the lessor and the property liable under the mechanics' lien law, for work and material furnished the lessee and going into the improvement of the building made by him, although the value of property may be materially enhanced by such improvements. (Construing secs. 1 and 4 of the act of Congress of July 2, 1884 [23 Stat at L. 64, chap. 143], relating to mechanics' liens, and citing *Albaugh* v. *Litho-Marble Decorating Co.* 14 App. D. C. 113.)

No. 1837. Submitted April 10, 1908. Decided May 6, 1908.

HEARING on an appeal by some of several complainants from a decree of the Supreme Court of the District of Columbia dismissing a bill in equity to enforce mechanics' liens.

*Affirmed.*

. The COURT in the opinion stated the facts as follows:

The several appellants and others filed suits against the appellee, Cecilia C. D'Audigne, to enforce mechanics' liens against a certain lot and improvements thereon known as the Hotel Barton, for labor done and materials furnished in repairing the building under contract with one J. Barton Key, lessee.

These suits were consolidated for trial, which resulted in a decree dismissing the several bills. There were some other complainants, who did not appeal from the decree, and there was a severance from them by the appellants. The aggregate demand is $8,220.11, made up of separate claims as follows: Langley, $3,771.22; Lookhead, $1,417.86; William H. McCuen & Co., $1,877,23; William H. McCuen, $272.55; James Linsky & Son, $881.25. The evidence in which there is no substantial conflict establishes the following facts:

Appellee was seised in fee of the premises on and before November 1, 1900. She lived in Paris, France. Acting through her brother, Henry May, who was her attorney in fact, she, on November 5, 1900, entered into an agreement with J. Barton Key by which she leased the said hotel property, then known as the "Hotel Wellington," with all furniture therein, to said Key for a term of five years, beginning November 1, 1900.

Key agreed to pay rent at the rate of $7,500 per year, payable in monthly instalments of $625. The lease contained the covenants usual in leases, for punctual payment, and against assignment. The lessee covenanted to keep the premises and furniture in good repair during the term, and to paint the outside of the house, and the roof at least twice during the term. There was the usual covenant for forfeiture of the lease for breach of covenants and for re-entry by lessor. There was a covenant on the part of the lessor that, in case of performance of all covenants by the lessee, the lessee should have the option of renewal at an annual rental of $8,000. The fifth clause of the lease, which is of importance in this controversy, reads as follows:

"Fifth. That no change shall be made in the construction of said building, or in alterations of partitions or stairways, without the written consent of the lessor first had and obtained; but the said lessee may, with the written consent of said lessor, make improvements, alterations, and extraordinary repairs, and, if such improvements, alterations, and repairs during the period of this lease equal the sum of $5,000, and are approved by the lessor, the said sum of $5,000 will be deducted from the amount of rent paid for said term, it being understood, however, and by this agreement provided, that only $1,000 shall be deducted during any one year of said tenancy. All such improvements, repairs, and alterations in excess of said $5,000, made during the term of said lease, shall be made and paid for by the said lessee."

Key soon became involved, and, on February 5, 1901, on a bill filed by one Scott, who had been advancing money to him and had some interest in the hotel receipts, receivers were appointed to take charge of the premises and conduct the business. Appellee intervened in said proceeding claiming overdue rent. A sale was made of the assets of Key under an order passed April 6, 1901. After sale was made, distribution was had of the proceeds. After paying claims of lien creditors, appellee received the balance, namely, $935.91, on account of rent then due, amounting to $3,750. On June 3, 1901, the receivers were

ordered to deliver the premises to the owner. The several appellants contracted with Key, on and after November 5, 1900, to furnish certain material and labor in making improvements and repairs on the premises. The accuracy of their several accounts is undenied, and early in February, 1901, they filed liens under the sections of the Code regulating mechanics' liens. The contract of Langley was for what may be called, in the mass, extraordinary repairs, as it provided for making a new entrance, enlarging the lobby, putting in extra stairs, etc. The entire cost, including some extra work, was $3,771.22, none of which has ever been paid. This was the first contract made. In January, 1901, McCuen & Company put in extra steam radiators and pipes for heating, and repaired the cooking range. Their contract provided that for the last two payments Key should give notes, due at four and six months respectively, to be indorsed by Scott, who was understood to be assisting Key with money. It would seem that the steam pipes and radiators of this work were in the nature of improvements or extraordinary repairs. Key paid $500 on this contract, leaving about $2,149.78 unpaid. James Linsky and Son painted and penciled the front of the building and did other outside and inside painting, at a charge of $1,281.25, of which $400 were paid by Key, leaving a balance due of $881.25. This seems work which Key had specially covenanted to do. Lockhead remodeled the plumbing, and put in new closets and bath tubs. This seems to come within the covenant for improvements and extraordinary repairs. Nine hundred and fifty dollars, on this account, were paid in checks by Scott, leaving a balance of $1,417.86.

All of the contracts aforesaid were made with Key, without procuring the written consent of the owner. One T. B. Huyck was the agent of the owner for the collection of rents. All of the complainants, except Lockhead, told Huyck of their arrangement with Key. Huyck told several of them that Key was well backed and good, and told all of them but Lockhead that Key had a lease under which he was authorized to make improvements, and that he could be credited therefor on the rent to the extent of $5,000, at the rate of $1,000 per year. They did

not ask to see the lease. It was not of record, and was apparently in the possession of the owner's attorney.

It appears that the plans for the work afterwards done by Langley had been prepared by an architect for Key; and that, on November 21, 1900, Key addressed a letter to Huyck inclosing the architect's statement, and a letter addressed to him authorizing him to make the improvements, which he was requested to have Mr. May sign and return. The letter consenting was never signed or returned, but was produced by defendant's counsel on the hearing, and offered in evidence. No inquiry seems ever to have been made about it by Key.

Evidence was offered by the complainants, which was objected to at the time by defendant, showing a lease made by defendant on August 1, 1901, of the premises to the Barton Company for five years at the rate of $7,500 per year. This contained substantially the same provisions as the former lease to Key, save that no allowance was made to the lessee for making improvements. It appeared by admission of defendant's counsel that the rent for November, 1900, was not paid, but by verbal arrangement between Key and defendant's agent that month's rent was allowed Key on account of the repairs that he was expecting to make, under the provisions of paragraph 5 of the lease, above set forth. This allowance had been made by Huyck.

Before the hearing below, the parties entered into a stipulation in which complainants conceded that the limit of their recovery was $5,000, and, in consideration of the deposit in the Union Trust Company, by defendant, of the sum of $7,000, to abide the result of the suit, the liens were transferred from the premises to said fund.

*Messrs. Tucker & Kenyon, Mr. E. E. Bailey, Mr. C. W. Fitts,* and *Mr. A. A. Hoehling, Jr.,* for the appellants.

*Mr. George E. Hamilton, Mr. Michael J. Colbert, Mr. John W. Yerkes,* and *Mr. John J. Hamilton* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The act of July 2, 1884, providing for mechanics' liens, was in force when these claims accrued, and their enforcement must be regulated thereby. The pertiment sections are the following:

"Sec. 1. Every building hereafter erected or repaired by the owner or his agent in the District of Columbia, and the lot or lots of ground of the owner upon which the same is being erected or repaired, shall be subject to a lien in favor of the contractor, subcontractor, materialman, journeyman, and laborer, respectively, for the payment for work or materials contracted for or furnished for or about the erection, construction, or repairing of such building, and also for any engine, machinery, or other thing placed in said building, or connected therewith, so as to be a fixture. * * * Sec. 4. * * * When a building shall be erected or repaired by a lessee, or tenant for life or years, or a person having an equitable estate or interest in such building or the land on which it stands, the lien created by this act shall only extend to and cover the interest or estate of such lessee, tenant, or equitable owner." 23 Stat. at L. 64, chap. 143; D. C. Comp. Stat. (*Abert & Lovejoy*) chap. 45, p. 366.

In determining the question presented by the record, we may assume, without so deciding, that the work done by the appellants under contract with Key was in the nature of the improvements and extraordinary repairs stipulated in clause 5 of the lease, and that the allowance of the first month's rent on that account, and other circumstances, amounted to a waiver of the requirement that written permission therefor should first be had by the lessor.

The agreement between the owner and Key was a lease, not uncommon in form, and cannot be considered at all as of the nature of a building contract. The Pennsylvania authorities relied on to convert it into a building contract, and make the lessee the agent of the owner to that extent (*Woodward* v. *Leiby,* 36 Pa. 437, 441; *Fisher* v. *Rush,* 71 Pa. 40, 44, and others) were controlled by a statute of that State. We need not pause to inquire into the points of difference or similarity between that statute and ours, for, if similar, those decisions are in conflict

with the interpretation heretofore given to our statute. *Albaugh* v. *Litho-Marble Decorating Co.* 14 App. D. C. 113, 120. The relation created by the contract was that of lessor and lessee, and not of principal and agent. Such a contract is rather a negation of the fact of agency than otherwise. *Rothe* v. *Bellingrath,* 71 Ala. 55, 66; *Albaugh* v. *Litho-Marble Decorating Co. supra.* In that case the contract was for a lease for ninety-nine years, the lessee agreeing to remove a building from the lot and erect a new building thereon at a cost of not less than $75,000, which was to be surrendered to the lessor, her heirs or assigns, at the end of the term, without charge to her. Other provisions of the lease do not appear in the record. An attempt made to fasten a mechanics' lien on the lot was denied. It was said by Mr. Justice Morris: "But this covenant involves no theory of agency, but quite the reverse. The parties to the lease dealt with each other, not as principal and agent, but practically as adverse parties. To hold that a lessor covenanting with a lessee for the security of his interest under the lease, the payment of rent probably, should construct a building upon the land in place of one to be demolished, would thereby and by virtue of such a covenant make the lessee his agent, and bind himself personally, as well as his property, for the contracts of the lessee in the performance of the covenant, seems to us to be wholly without warrant in law or in reason; and we greatly question whether even the most positive legislation could impose liability upon one person for the obligation of another in such a contingency. Certainly no such liability is imposed, or sought to be imposed, by our mechanics' lien law."

The lessee in this case was bound by the rule of the common law, as well as expressly by his covenant, to keep the building in good repair during the term; and the fact that the lessor agreed to permit him, under conditions, to make improvements and extraordinary repairs, for which she would allow him the sum of $5,000 to be deducted from the rent at the rate of $1,000 per year, did not alter the relations of the parties as lessor and lessee, or convert the lessee into her agent for that particular purpose. Section 4 of our statute, quoted above, meets the

conditions here by expressly limiting the lien made by a lessee or tenant for life or years, to his interest only in the property improved. In Maryland, in a case where the contract was very much like the present one in substance, and under a clause of a statute quite similar to sec. 4, *supra,* it was held that the mechanics' lien for material furnished for the erection of buildings under the terms of the lease attached to the interest of the lessee only. *Hoffman* v. *McColgan,* 81 Md. 390, 395, 32 Atl. 179, and earlier cases cited therein.

It seems quite clear from the facts and circumstances in evidence, that the complainants in this case, in contracting with Key, did not regard him as the agent of the lessor, but as acting for himself and in his own interest. He was apparently solvent, and was believed to have the support of Scott, a man with money. In one of the contracts it was expressly stipulated that for the last two payments Scott was to join in the execution of the notes. The aggregate contracts of the parties working on the premises about the same time amounted to far more than the stipulated allowance for improvements in the lease; and they knew this limitation, at least, and that it was payable only by credits on the rent of not more than $1,000 per year during the term. That they may have regarded the provision of the lease, of which they had heard, but did not consider it necessary to examine, as of some slight security, may be conceded. And it is true that, had Key continued to perform the covenants of his lease, they might, by timely and appropriate proceedings, have subjected the instalments due him as a credit on the rent, as they accrued. But that stipulation was necessarily dependent upon the continued performance by Key of the covenants of his lease, and his interest terminated with his failure and the consequent forfeiture of his lease. Failing in his attempt to keep the hotel business going, and having ceased to pay any rent at all, there was nothing on which he could have founded a claim for reimbursement by the lessor if he had paid for the improvements as he had contracted with complainants too. Their right attaching to his interest, as created by the lease contract, could rise no higher than his, and necessarily fell with the termina-

tion of the lease. *Rothe* v. *Bellingrath,* 71 Ala. 55, 60; *Hoffman* v. *McColgan, supra,*

While it may be true that the value of the property was materially enhanced by the improvements made by Key, those improvements at once became an inseparable part of the realty, and, by virtue of an established rule of law, reverted therewith to the owner on the failure of the lessee to perform the contract of lease under which he entered; and there were no dealings with, or representations by, the owner and lessor, that would estop her from the assertion of her right, as against the complainants. There is no recognizable foundation for the assertion of an equitable right, on their behalf, against the owner or her property. With ample opportunity to know just what the rights and interests of Key were, they extended credit to him and took the chances of his ability to pay. Sympathy with them in their disappointment cannot justify the transfer of their losses to the owner of the property whose conduct had nothing to do with their occasion.

The decree dismissing the bills was right, and will therefore be affirmed with costs. *Affirmed.*